Filed 3/25/21  P. v. Fabela CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B301528 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA109112) |
| v. | |
| LUKE MATTHEW FABELA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Luke Matthew Fabela was found guilty of the first degree special circumstance murders of an elderly couple, Armie and Shirley Isom,[1] the first degree burglary of the Isoms' residence, and the first degree burglary of the residence of another elderly victim, Susan Sanna. On appeal, Fabela argues the evidence was insufficient to support his conviction for burglary of the Isoms' residence, his convictions for first degree murder under a felony-murder theory, and the burglary-murder special circumstance findings. Fabela also asserts the prosecutor committed misconduct during closing argument by making inflammatory statements intended to appeal to the jury's passions or prejudices, and by misstating the law on first degree premeditated and deliberate murder. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Murder of the Isoms

Armie and Shirley resided in a large two-story house on Roughrider Road in La Verne, California. The secluded hilltop property included 58 acres of undeveloped land and several other structures. There was a gated entrance to the property at the end of a cul-de-sac, which could be reached from the base of the hill by traveling up Live Oak Canyon Road, a narrow, winding road with no sidewalk.

On December 26, 2014, around 1:00 p.m., Eutimio De La Rosa, the Isoms' longtime gardener, discovered the bodies of Armie and Shirley at their home. De La Rosa had been welding in a workshop on the property when he heard the sound of the

_____

[1] For clarity and convenience, we refer to the Isoms by their first names.

water pump breaking down.  He drove up to the house in a golf cart to check on the pump.  On the way, De La Rosa saw Shirley's body lying on the ground in the carport area outside the home's upper level entrance.  He then saw Armie's body on the floor inside the entrance.  De La Rosa believed Shirley was dead and Armie was seriously injured.

Paramedics responded to the Isoms' home around 1:20 p.m.  Shirley was pronounced dead at the scene.  Armie was found unresponsive, but still breathing.  He was transported to a hospital where he later died from his injuries.  Armie was 89 years old and Shirley was 75 years old at the time of their deaths.

Shirley died from multiple blunt force and sharp force injuries.  She suffered a fractured skull as a result of blunt force trauma to her head.  She had a large sharp force wound on her left shoulder, another sharp force injury above her eye, and lacerations on her arm, leg, and ear.  She had an abrasion on the back of her shoulder consistent with having been dragged, and a degloving injury on her hand consistent with the hand being pulled out from a closed door or trunk.  Shirley also sustained several defensive wounds, including incise wounds on both hands and a fractured finger and wrist.  She had one deep postmortem cut on her neck.  All other injuries were inflicted prior to her death.

Armie died from multiple blunt force injuries to his head.  He suffered extensive skull fractures and displacement, which caused bleeding in his brain.   He had a large laceration on the left side of his forehead and another laceration above his left ear.  He had bruises on his lower lip, around his eye, and on his cheek.  Armie also had several lacerations and bruises on one arm and both hands consistent with defensive wounds.

The police found blood throughout the upper level of the Isoms' home, including the foyer, kitchen, and master bedroom. Inside the foyer, where Armie was found, there were multiple bloodstains and items strewn about the floor. These items included broken statues, glasses, dentures, and a fingernail fragment beneath an entry table. Another fingernail fragment was found near a desk in an adjacent office. Both fingernail fragments were painted with a decorative snowman, and the one found in the foyer matched a broken fingernail found on Shirley. The broken statutes were made of a heavy material and had blood on them. Armie's blood was found on one statute and Shirley's blood was found on the other. Shirley's blood also was found in the kitchen on the edge of the sink, inside an open drawer, and on a knife handle inside the drawer.

There were drag marks of Shirley's blood leading from the foyer through the front door of the home. Shirley's blood and a clump of her hair were found on the front porch. Her blood also was found on a set of keys on a porch table. Shirley's Lexus was parked in the carport near where her body was discovered. Her blood was found inside the vehicle, including in a shoeprint on the driver's floormat. Her blood also was found in several locations on the exterior of the Lexus, including the wheel well and tread of the tires. A large stain of Shirley's blood was found underneath the vehicle. The trunk of the Lexus, which would not stay open, contained Shirley's bloody sweatshirt as well as blood on the interior lid.

Based on this evidence, a crime scene reconstruction expert testified that the perpetrator likely attacked Armie in the foyer and Shirley in the adjacent office. The blood pattern evidence showed Shirley likely was dragged or pulled through the foyer

and into the driveway. The perpetrator then attempted to place Shirley inside the trunk of the Lexus, but failed to do so. The blood found underneath the Lexus and on the tires indicated the vehicle was moved a short distance after Shirley was attacked.

Shirley's cell phone was the only item missing following the murders. According to her cell phone records, Shirley had two calls with her daughter between 11:22 a.m. and 12:42 p.m., and her cell phone was in the vicinity of the Isoms' home during that time. At 1:17 p.m., the cell phone was still near the Isoms' home, but moving slightly east. Later that day, the cell phone was in the Pomona area for a few hours, and was then turned off.

II.  **The Identification of Fabela as the Murderer**

Although Fabela had no known connection to the Isoms, his DNA was found in several locations at the scene of the murders. Fabela was the single source contributor of DNA found underneath Shirley's fingernail fragment in the foyer. He was a major contributor of DNA found on top of that fingernail fragment. In addition, Fabela was a minor contributor of DNA taken from Shirley's right hip. He was also a minor contributor of DNA found on the interior trunk lid of the Lexus.

Approximately one week before the murders, Fabela was in the neighborhood near the Isoms' property. He approached a man who was working nearby and asked for a cigarette. On December 26, 2014, numerous witnesses observed Fabela walking in the direction of the Isoms' property shortly before the murders, and away from the property shortly after the murders occurred. Between 12:00 p.m. and 12:40 p.m., multiple witnesses saw Fabela walking on or near Live Oak Canyon Road toward the Isoms' property. He was wearing dark pants and a dark sweatshirt with the hood pulled over his head. He was carrying a

5

large heavy backpack. Fabela stood out to the witnesses, in part, because pedestrians were rarely seen walking along that road. Around 12:40 p.m., another witness saw a man wearing a hooded sweatshirt and a large camping-style backpack walking on Roughrider Road toward the gated entrance of the Isoms' property. The man seemed out of place in the secluded neighborhood.

Around 1:10 p.m., the Isoms' closest neighbor on Roughrider Road saw a man who looked similar to Fabela walking away from the Isoms' property. The hood of his sweatshirt was pulled over his head and he was carrying a heavy bag. A worker who was eating lunch outside a residence on Roughrider Road also saw a man with a hooded sweatshirt and a backpack walking away from the Isoms' property. The man wore work boots with a red stain and walked quickly down the hill. A few minutes later, De La Rosa arrived in a golf cart and said in a panicked voice that someone had killed his bosses.

Around 1:20 p.m., a fire captain who was responding to the scene of the murders saw a man walking southbound on Live Oak Canyon Road away from the Isoms' property. The man wore a hooded sweatshirt and a backpack and walked unusually fast, with a strange, strained gait. A paramedic who was responding to the scene also saw a man with a dark hooded sweatshirt and a backpack walking southbound on Live Oak Canyon Road toward the base of the hill. Surveillance video from a residence on Live Oak Canyon Road captured the fire engine going up the road at 1:20 p.m. and a man walking down the road less than a minute later.

Around 1:45 p.m., Fabela approached a residence located near the intersection of Live Oak Canyon Road and East College

Way. Fabela was wearing a dark hooded sweatshirt, jeans, and brown boots. He was also carrying a backpack. Fabela told the owner of the residence that he had fallen and asked if he could use a hose to clean himself off. The owner did not see any blood or injuries on Fabela, but did notice blotches on his shoes. After the owner gave him a bottle of water, Fabela said, "God is good all the time," and walked away.

### III.   **Fabela's Subsequent Theft-related Crimes**

Susan Sanna lived in a mobile home park in La Verne about two and a half miles from the Isoms' property. The Isoms' house, which was at the highest point on the hilltop and surrounded by bright purple flowers, was visible from the mobile home. Fabela's mother, Josephine Baca, lived with Sanna and was her in-home caregiver. Fabela stayed with Baca and Sanna for about a year between 2012 and 2013.

On January 13, 2015, Fabela visited Baca at Sanna's home. After they had dinner together, Fabela took Baca's car keys from her bedroom and took her car without permission.[2] Baca called the police. The following day, the police found Baca's car. When Baca later looked through the car, she found a plastic storage container that belonged to Fabela in the trunk. Inside the container were clothes, a duffle bag, a broken cell phone, and Fabela's wallet. Baca threw away the duffel bag and some of the

---

[2] Baca testified, without objection, that she did not allow Fabela in her bedroom when he visited because he would steal from her.

clothes that had stains on them. She gave the wallet and the cell phone to the police.[3]

On January 14, the day after Fabela stole Baca's car, he returned to the mobile home. He asked Sanna if he could come inside to smoke a cigarette. When Sanna refused to let him in, Fabela forced open the sliding glass door. He then took Sanna's purse from her bedroom.

On January 15, Fabela stole a Nissan Maxima from the lot of a used car dealership in Pomona. The theft was captured on the dealership's surveillance video. The following day, Fabela returned to the same lot. The owners recognized Fabela from the video and called the police, leading to his arrest.

## IV.    **Fabela's Statements to Undercover Officers**

On March 10, 2015, the Los Angeles County Sheriff's Department transported Fabela from San Bernardino to Los Angeles for a live lineup. Two undercover officers posing as inmates rode in a van with Fabela for the trip to Los Angeles. During the trip, Fabela made loud comments about his mental health, including that he was bipolar and schizophrenic and heard voices. He asked one undercover officer if a person with this psychiatric condition could receive a life sentence or the death penalty. He also said that, if he was going to "spend the rest of [his] life behind bars[,] it's gonna be in a mental institute all the way." When the officer asked about his crime, Fabela replied that he had stabbed two people and made a stabbing

---

[3] The broken cell phone found in the car belonged to a woman who had lost the phone in July 2014. The owner of the phone did not know Fabela.

8

motion with his hand. Fabela told the other undercover officer that the police did not have much evidence because his mother had inadvertently thrown away a knife and bloody clothing that were in the trunk of her car. Fabela also said he resided in Pomona and would "run the streets of Pomona . . . doing stupid stuff."

A third officer posing as an inmate accompanied Fabela on the trip back to San Bernardino. When the officer asked Fabela for advice on beating a murder charge, Fabela suggested that he should pretend to be crazy but to make sure to back up his claim with paperwork. During the trip, Fabela disclosed to the officer that he had been charged in a double homicide. He claimed, however, that he was off his medication when he committed the crime and did not remember any of it. Fabela told the officer, "It's out of my mind for a reason, you know what I'm saying? Just so I don't have to live with it."

## V. **Jury Verdict and Sentencing**

The jury found Fabela guilty of the first degree murders of Armie and Shirley (Pen. Code,[4] § 187, subd. (a)), the first degree burglary of the Isoms' residence (§§ 459, 460), and the first degree burglary of Sanna's residence (§§ 459, 460). The jury found true the special circumstance allegations that Fabela committed multiple murders (§ 190.2, subd. (a)(3)), and while engaged in the commission of a burglary (§ 190.2, subd. (a)(17)). The jury also found true the allegations that Fabela personally used a deadly or dangerous weapon in the commission of the murders and the burglary of the Isoms' residence (§ 12022,

---

[4] All further statutory references are to the Penal Code.

9

subd. (b)(1)) and that he committed the burglary of Sanna's residence against a person age 65 years or older (§ 667.9).[5]

Fabela was sentenced to two consecutive terms of life without the possibility of parole for the murders of the Isoms, a consecutive 13-year term for the burglary of Sanna's residence, and an additional five-year term based on a prior serious felony conviction. The trial court stayed the sentence for the burglary of the Isoms' residence pursuant to section 654.

Fabela timely appealed.

## DISCUSSION

### I.    Sufficiency of the Evidence

On appeal, Fabela challenges the sufficiency of the evidence supporting (1) his conviction for burglary of the Isoms' residence, (2) his convictions for first degree murder of the Isoms under a felony-murder theory of liability, and (3) the true findings on the burglary-murder special circumstance allegations. Fabela contends the evidence was insufficient to support each of these convictions and findings because the prosecution failed to prove that he intended to commit a theft at the time he entered the Isoms' home. Fabela also claims the evidence was insufficient to support a first degree felony-murder conviction and burglary-murder special circumstance finding because the prosecution failed to show that he killed the Isoms during the commission of an intended burglary.

---

[5] The jury found Fabela not guilty of the robbery of Shirley, and found the robbery-murder special circumstance allegation for each murder count to be not true.

10

## A.    *Governing Legal Principles*

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)  Our "task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' [Citations.]  The relevant inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278.)  "The same standard applies when examining the sufficiency of the evidence supporting a special circumstance finding." (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

Burglary requires the entry into a dwelling or other specified structure with the intent to commit theft or any felony. (§ 459; *People v. Wallace* (2008) 44 Cal.4th 1032, 1077.)  To constitute a burglary, the defendant must intend to commit the theft or felony at the time of entry.  (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.)  A burglary " 'is complete when there is an entry into a structure with felonious intent, "regardless of

11

whether the felony or theft committed is different from that contemplated at the time of entry, or whether any felony or theft actually is committed." ' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 232; accord, *People v. Shaw* (2017) 18 Cal.App.5th 87, 93.)  A defendant's intent to commit a burglary " 'may be inferred from all of the facts and circumstances disclosed by the evidence.' " (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1326.)

Under the felony-murder rule, a murder "committed in the perpetration of, or attempt to perpetrate" one of several enumerated felonies, including burglary, is first degree murder. (§ 189, subd. (a).)  "The mental state required for felony murder is ' "the specific intent to commit the underlying felony" ' [citation], and ' "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death." ' " (*People v. Brooks*, *supra*, 3 Cal.5th at p. 61.)  " ' "[T]he killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing." ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 169.)  Additionally, "[f]irst degree felony murder does not require proof of a strict causal or temporal relationship between the felony and the killing.  [Citation.]  Rather, a killing has been 'committed in the perpetration of' the underlying felony within the meaning of section 189 'if the killing and the felony are parts of one continuous transaction.' " (*Brooks*, at pp. 61–62.)

The felony-murder special circumstance applies to a murder "committed while the defendant was engaged in . . . the commission of, [or] attempted commission of," certain enumerated felonies, including burglary.  (§ 190.2, subd. (a)(17).)  To prove a felony-murder special circumstance allegation, " ' "the

prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder." [Citations.]' [Citation.] '[A] jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary," but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder.' [Citation.] '[A] "concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." ' " (*People v. Castaneda*, *supra*, 51 Cal.4th at pp. 1326–1327.)

B. ***Substantial Evidence Supported the Burglary Conviction, First Degree Murder Convictions, and Burglary-murder Special Circumstance***

Viewing the evidence in the light most favorable to the jury's verdicts, we conclude there was substantial evidence to support a finding that Fabela intended to commit a theft at the time he entered the Isoms' residence, and that his commission of the burglary was not merely incidental to the Isoms' murders. As our Supreme Court has observed, if " ' "a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money." ' " (*People v. Jackson* (2016) 1 Cal.5th 269, 346; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 508 [ there " 'is no better proof that [defendant] entered the [victim's house] with intent to commit robbery than a showing he did in fact commit robbery after his entry' "].)

13

In this case, the jury reasonably could have concluded that Fabela intended to commit a theft when he entered the Isoms' home because he took Shirley's cell phone and attempted to take her vehicle. The evidence showed that Fabela killed the Isoms between 12:45 p.m. and 1:15 p.m. Shirley's cell phone was in her possession at 12:42 p.m. when she had a call with her daughter. The cell phone began moving away from the Isoms' residence at 1:17 p.m. in the same direction that Fabela fled right after the murders. Later that afternoon, the cell phone was in Pomona, where Fabela lived and spent a lot of his time. Based on this evidence, the jury rationally could infer that Fabela stole Shirley's cell phone. Although no other property was taken during the murders, the evidence showed that, after Fabela attacked Shirley, her Lexus was moved a short distance. Shirley's blood was found on her car keys and in various locations inside the vehicle, including in a shoeprint that the assailant left on the driver's floormat. From this evidence, the jury reasonably could infer that Fabela also attempted to steal Shirley's Lexus, but ultimately abandoned the attempt and fled on foot.

Other evidence supported a finding that Fabela intended to commit a theft when he entered the Isoms' home. A jury can "infer a defendant's intent to steal from his commission of other similar crimes." (*People v. Jackson, supra*, 1 Cal.5th at p. 346; accord, *People v. Virgil* (2011) 51 Cal.4th 1210, 1264.) Here, the jury heard evidence that, less than a month after the murder of the Isoms, Fabela stole two vehicles—one from his mother and another from a used car dealership. The jury also heard evidence that, within this same time period, Fabela forced his way into Sanna's residence and stole her purse. While Sanna was not a stranger to Fabela, she, like the Isoms, was an elderly victim and

14

was present in her home when Fabela committed the theft. (See *People v. Scott* (2015) 61 Cal.4th 363, 398 [defendant's subsequent burglaries were relevant to showing he entered murder victim's home with intent to steal].) Additionally, the evidence showed that, about a week before the murders, Fabela was seen walking in the area where the Isoms lived. Given that the Isoms resided in a secluded neighborhood at the top of a hill, a rational jury could infer that Fabela was casing the area for a future planned burglary.

The fact that Shirley's cell phone was the only property taken from the Isoms did not preclude the jury from finding that Fabela harbored a specific intent to steal when he entered their home. (See *People v. Moore* (2011) 51 Cal.4th 386, 408 [that "defendant might have planned the burglary better did not negate or even vitiate the force of the inferences the jury could reasonably draw"]; *People v. Hughes* (2002) 27 Cal.4th 287, 357–358 [jury could infer defendant formed intent to steal before or during murder even though he "took only [victim's] wallet and left behind other items of substantial value"].) Moreover, there was no evidence " 'suggesting, or requiring the jury to conclude, that defendant took . . . property merely to obtain a reminder or token of the incident [citation], to give a false impression about his actual motive for the murder, or in some other way to facilitate or conceal the killing [citation]. Nor was there substantial evidence of any motive for the murder apart from accomplishing the [theft].' " (*People v. Virgil, supra*, 51 Cal.4th at p. 1264; accord, *People v. Bolden* (2002) 29 Cal.4th 515, 554.) Rather, based on the totality of the evidence, the jury reasonably could conclude that theft was at least a concurrent motive for Fabela's entry into the Isoms' home, and that the burglary and

15

the murders were part of one continuous transaction. This is sufficient to support a conviction for burglary and first degree felony murder, and a burglary-murder special circumstance.

Fabela asserts that, even if he entered the Isoms' home with the intent to commit theft, there was no evidence that he killed the Isoms during the commission of, or while engaged in, a burglary, as required for a felony murder conviction and a burglary-murder special circumstance finding. Fabela argues the evidence instead showed that any theft of property from the Isoms' home occurred only after he had already committed the murders. However, to prove first degree felony murder or the burglary-murder special circumstance, the prosecution did not have to prove that Fabela stole any items belonging to the Isoms before he killed them. Rather, the prosecution had to prove that Fabela had formed an intent to steal before or during the killings, and that the burglary was not merely incidental to the murders. (See *People v. Horning* (2004) 34 Cal.4th 871, 903 [while burglary felony murder requires intent to steal be formed before fatal blow is struck, it does not require defendant actually commit burglary before committing murder]; *People v. Tafoya* (2007) 42 Cal.4th 147, 171 [burglary-murder special circumstance proven where defendant formed intent to take victims' property before murders and then committed murders to facilitate taking of property].) Thus, even if Fabela did not take Shirley's cell phone until after he killed her, so long as he intended to commit a theft upon entry into the Isoms' home, the jury could find him guilty of first degree felony murder with a burglary-murder special circumstance.

Fabela also argues the jury's verdicts on the robbery count and robbery-murder special circumstance allegations show the jury necessarily believed that the taking of Shirley's cell phone

16

"was merely an afterthought and incidental to the murders." We disagree. During deliberations, the jury asked the trial court if the elements of robbery applied where the victim was dead or unconscious. The court responded that if Shirley (the named victim in the robbery count) was dead, unconscious, or otherwise unaware of the taking of her property, then the law of robbery did not apply. The jury thereafter found Fabela not guilty of robbery and found the robbery-murder special circumstance allegations to be not true.

The jury's verdicts, coupled with its question about robbery and the trial court's response, indicate that the jury believed Fabela killed Shirley, or at least rendered her unconscious, before he took her cell phone.[6] As discussed, however, it does not matter whether the taking of the cell phone occurred before or after the murders. For purposes of the felony-murder rule and burglary-murder special circumstance, what matters is whether Fabela harbored an intent to commit a theft at the time he committed the murders. The verdicts on the robbery count and the robbery-murder special circumstance allegations did not preclude the jury from finding that, at the time Fabela entered the Isoms' home, he had already formed the intent to steal, and

---

[6] To the extent the jury may have interpreted the trial court's response to mean that the victim of a robbery must be alive and conscious at the time of the taking, we note such an interpretation would be legally incorrect. "While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property." (*People v. Navarette* (2003) 30 Cal.4th 458, 499.)

17

that he killed both Armie and Shirley to facilitate his intended theft.

Fabela further contends that, based on the evidence at trial, it was more likely that his intent in hiking to the Isoms' hilltop property was to search for a place to camp or an empty house in which to find shelter. Fabela notes he was homeless at the time and carrying an already-full backpack, and there was no evidence that he was in possession of burglary tools or that he forcibly entered the Isoms' home. However, the mere fact that the evidence may support other possible scenarios does not render the evidence insufficient to support the jury's verdicts. (*People v. Castaneda*, *supra*, 51 Cal.4th at p. 1326.) A reviewing court is "not free to reform the verdict simply because another theory is plausible." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.) " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Jackson*, *supra*, 1 Cal.5th at p. 345.) Here, the jury reasonably could conclude that Fabela intended to commit a theft when he entered the Isoms' secluded hilltop residence and murdered Armie and Shirley, and that the burglary was not merely incidental, or an afterthought, to the murders. Substantial evidence therefore supported Fabela's burglary conviction, his first degree murder convictions, and the burglary-murder special circumstance findings.

II.  **Prosecutorial Misconduct**

Fabela argues the prosecutor committed prejudicial misconduct during closing argument by (1) making inflammatory statements to the jury that were intended to appeal to the jurors' passions and prejudices, and (2) misstating the law on willful,

deliberate, and premeditated murder.  Fabela also asserts that, to the extent he forfeited any of these claims by failing to object, he received ineffective assistance of counsel.  We find no basis for reversal.

A.  *Governing Legal Principles*

" ' " ' 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]  In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.)  Where, as here, " 'a claim of misconduct is based on the prosecutor's comments before the jury, " ' the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334.)  " 'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Flores* (2020) 9 Cal.5th 371, 403.)

"To preserve a claim of prosecutorial misconduct on appeal, ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]" [Citation.]  The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the

19

harm.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 204.) " 'Because we do not expect the trial court to recognize and correct all possible or arguable misconduct on its own motion [citations], defendant bears the responsibility to seek an admonition if he believes the prosecutor has overstepped the bounds of proper comment, argument, or inquiry.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 800.)

B. ***The Prosecutor Did Not Improperly Appeal to the Passion or Prejudice of the Jury***

Fabela claims the prosecutor made several inflammatory statements during closing argument by referring to him as a "coward," and by using terms such as "butchered," "slaughtered," and "mutilated" to describe how he murdered the Isoms. Because Fabela did not object to any of the prosecutor's remarks other than her references to him as a coward, he has forfeited those claims on appeal. However, even if the claims were not forfeited, Fabela has failed to show misconduct.

During closing argument, the prosecutor detailed what the evidence showed about how the murders of the Isoms occurred. At one point, the prosecutor stated that Shirley and Armie were "literally slaughtered. This isn't your regular murder. They are slaughtered—it's like going to a slaughter house." In describing how Fabela tried and failed to load Shirley's body into the trunk of her car, the prosecutor commented: "What a horrific way to go. What a horrific way to go." She later told the jury to "just look at the carnage that was caused." In discussing how Fabela stole a vehicle from a car dealership and then returned the next day, the prosecutor remarked, "Now, why he came back? Who knows? Were the managers going to meet the fate of the Shirley Isoms of the world and the Armie Isoms of the world? Who knows?"

At certain points, the prosecutor referred to Fabela as a *coward*. In describing how Fabela murdered Armie by hitting him with a heavy statue, the prosecutor stated, "You know, pick on someone who can beat you up, dude. Don't go to an 89-year-old man and take a concrete statute and put—what a coward. What a coward." In discussing how Fabela left his DNA on Shirley during the struggle with her, the prosecutor again stated, "What a coward." At the next recess, defense counsel objected to the prosecutor's use of the word *coward* as inflammatory and improper. The trial court directed the prosecutor to refrain from name-calling, explaining that "cases of this nature generate certain levels of emotion." The court also admonished the prosecutor "to avoid giving juries ammunition to assist them in rendering, perhaps, an improper verdict, one based on their emotion" rather than on the evidence in the case. The prosecutor replied, "Sure, Your Honor. [¶] I will take the court's admonishment; but with the caveat that these actions were cowardly and done by a cowardly person, but I won't say it again." The court stated, "Well, I appreciate that. You've certainly made that abundantly clear for the jury."

When closing argument resumed, the prosecutor continued with a discussion about Fabela's conduct after the murders. In describing Fabela's postarrest statements to the undercover officers, the prosecutor noted Fabela never denied that he had committed the murders. The prosecutor then stated, "You know why he didn't say that? Because he willfully, deliberately, with intent to kill two elderly individuals, murdered—not murdered, ladies and gentlemen, butchered, slaughtered, killed those people. That's who you're looking at." She also argued that

21

Fabela had an intent to kill "because of the way the victims were mutilated."

A prosecutor " 'enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom.' " (*People v. Fayed*, *supra*, 9 Cal.5th at p. 204.)  In addition, a " 'prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Rivera*, *supra*, 7 Cal.5th at p. 337.)  The " 'use of derogatory epithets to describe a defendant is not necessarily misconduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1021.)  As the Supreme Court has explained, " '[a]rgument may include opprobrious epithets warranted by the evidence.  [Citation.]  Where they are so supported, we have condoned a wide range of epithets to describe the egregious nature of the defendant's conduct,' including ' "monstrous," ' ' " 'perverted murderous cancer,' " ' ' " 'human monster,' " ' and ' "mutation." ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 341; see *People v. Montes* (2014) 58 Cal.4th 809, 890 [no misconduct where prosecutor called defendant a " 'monster,' " a " 'sociopath,' " and a " 'reprehensible excuse for a human being' "]; *Tully*, at p. 1021 [no misconduct where prosecutor referred to defendant as a " 'despicable excuse for a man,' " " 'garbage,' " and a " 'sucker' "]; *People v. Thomas* (2012) 54 Cal.4th 908, 943 [no misconduct where prosecutor described defendant as a " 'vile, nasty predator of women,' " a " 'sociopath,' " and a " 'walking cancer' "].)

Here, the prosecutor's use of epithets in calling Fabela a *coward* and *cowardly*, and in describing the murders of the Isoms in terms such as *butchered*, *slaughtered*, and *mutilated* did not

22

constitute misconduct.  Such descriptive language was warranted by the evidence, which demonstrated that Fabela brutally murdered the elderly couple by repeatedly striking them with a heavy solid object and stabbing them with a knife or other sharp instrument.  Fabela's attack on Shirley was particularly vicious as the evidence suggested that he also dragged her out of the house by her hair and tried to force her into the trunk of her car before killing her.  In his statements to the undercover officers, Fabela expressed no remorse for the murders, but rather stated that the entire incident was "out of [his] mind" so that he did not "have to live with it."

The prosecutor's comments about Fabela and the egregious nature of his crimes were thus founded on the evidence and fell within the permissible bounds of argument.  While the statement about the owners of the car dealership meeting the same fate as the Isoms was speculative and unfounded, it was a brief and isolated remark that had no reasonable likelihood of inflaming the jury.  Moreover, the trial court instructed the jury that "[n]othing that the attorneys say is evidence," and that in "their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."  " 'We presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' "  (*People v. Dalton* (2019) 7 Cal.5th 166, 260.)

C. ***The Prosecutor Did Not Commit Prejudicial Misconduct in Defining Willful, Premeditated and Deliberate Murder***

Fabela contends the prosecutor also committed misconduct by misstating the law on what constitutes willful, premeditated,

23

and deliberate murder.  We conclude Fabela forfeited this claim by failing to raise a timely objection at trial or to seek a curative admonition.  Even if the claim were preserved, however, Fabela has failed to demonstrate any prejudicial misconduct.

During closing argument, the prosecutor described first degree willful, premeditated, and deliberate murder as follows: "All it is is some thought.  In order to go from . . . second to first, all you need is some thought.  That's why it says willful—a willful act, deliberation, and premeditation.  [¶]  Now, deliberately acting is your deliberation.  Premeditation can be planning.  You can plan your crime for a long time.  You can plan your crime a day in advance.  Or you can plan your crime right there as you're doing it.  [¶]  Now, ladies and gentlemen, I suggest to you that there's evidence of planning in this case, and I'll go over it with you.  But even if there weren't, if you look at the extent of the injuries, every time he picks up a knife to slash Shirley Isom it's willful, deliberate, and thought-provoking, premeditated.  Every time he picks up a statue and hits the elderly victims on the head, it's willful, deliberate, and premeditated.  So even if you didn't have any planning evidence, which you do, but even if you didn't have it, willful, premeditated, deliberation happens every time he makes an act towards one of those victims."

The prosecutor then explained, "Willful is intentional.  Deliberate is formed and arrived at after careful thought, weighing of consideration.  Premeditated, considered beforehand.  [¶]  Now, it can happen in a blink of an eye, ladies and gentlemen.  It's not judged by how much time.  That's what I was talking about when I said—you have planning evidence in this case, but it doesn't need planning evidence.  It could happen as

he's committing the crime, which in this case—I don't see how intent to kill in this case can be separated from premeditated, deliberation, and willfulness. You just can't separate it. They go hand-in-hand. I'm trying to talk about it separate so you can see all the elements; but as I do it, I meld them, too, because you can't separate them in this case. It's just—what he did was so horrific and intentional and premeditated that you can't separate them. But there doesn't have to be any planning. It can happen in a blink of an eye." Later, the prosecutor again stated that "you cannot separate intent from premeditation from deliberation from willfulness in this case."

On appeal, Fabela argues the prosecutor made a number of confusing and misleading statements about the definition of willful, premeditated, and deliberate murder. In particular, Fabela asserts the prosecutor misinformed the jury that premeditation and deliberation merely required "some thought" and "deliberately acting," and could "happen in a blink of an eye." He further contends the prosecutor improperly conflated the elements of first and second degree murder by telling the jury that "you just can't separate" intent to kill from premeditation and deliberation in this case.

As Fabela acknowledges, however, he never objected to any of the statements about which he now complains. A defendant generally " ' "may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) While the failure to object may be excused if an objection would have been futile or if an admonition would not have cured the harm caused by the

misconduct, a "prosecutor's misstatements of law are generally curable by an admonition from the court." (*Ibid*.) In this case, there is nothing in the record to suggest that an objection to the alleged misstatements would have been futile, or that a prompt admonition by the court would not have cured any harm. Fabela thus forfeited this claim of prosecutorial misconduct on appeal.

Even if not forfeited, Fabela's claim fails on the merits. When considered as a whole and in context, the prosecutor's statements were intended to convey to the jury that, while a premeditated and deliberate killing requires careful consideration, it does not require a lengthy and involved thought process. As the Supreme Court has explained, for purposes of proving premeditation and deliberation, the " 'true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.) The gist of the prosecutor's argument that a premeditated and deliberate decision to kill could be made quickly was consistent with this principle.

Overall, the prosecutor's argument that premeditation and deliberation cannot be separated from intent to kill in this case did not improperly conflate the elements of first and second degree murder. The reflection required for first degree premeditated murder may be revealed by, among other things, "planning activity, motive, and the manner of the killings." (*People v. Potts*, *supra*, 6 Cal.5th at p. 1027.) Here, the prosecutor primarily relied on the manner of the killings to show both an intent to kill and a premeditated and deliberate killing. In particular, the prosecutor argued to the jury that the violent and prolonged nature of the killings not only demonstrated that

Fabela intended to kill the Isoms, but also that he had time to reflect on his actions as he was repeatedly bludgeoning and stabbing them and chose to continue his attack. (See *id.* at p. 1028 [premeditation and deliberation shown where attack "involving multiple weapons" and "numerous stabs and slashes" was "undoubtedly 'prolonged' "]; *People v. Sandoval* (2015) 62 Cal.4th 394, 425 [the "fact that the manner of killing is prolonged . . . supports an inference of deliberation"].) The prosecutor never suggested to the jury that premeditation and deliberation could be shown solely by an intent to kill.

Some of the prosecutor's statements are more concerning. The prosecutor's remarks that premeditation and deliberation merely require *some thought* and *deliberately acting*, and *can happen in a blink of an eye*, are confusing and inconsistent with the mental state required for premeditated and deliberate murder. In the context of first degree murder, " ' " 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*People v. Potts, supra*, 6 Cal.5th at p. 1027.) While a calculated decision to kill can be reached quickly, it requires more than "some thought" or "deliberately acting," and does not occur "in the blink of an eye." (See *People v. Solomon* (2010) 49 Cal.4th 792, 829 [premeditation and deliberation do not occur " 'in a 'flick of an eye' "].)

Ultimately, however, it not reasonably likely that the jury applied these remarks in an erroneous manner. In describing the concepts of premeditation and deliberation to the jury, the prosecutor correctly stated that "[p]remeditated [is] considered beforehand," and "[d]eliberate is formed and arrived at after

27

careful thought [and] weighing of consideration." In addition, the trial court properly instructed the jury on the legal definitions of premeditation and deliberation, and further informed the jury that if the arguments of counsel conflicted with the court's instructions, it must follow the instructions. We presume the jury understood and followed the instructions in this case. (*People v. Erskine* (2019) 7 Cal.5th 279, 303.) Under these circumstances, the prosecutor's argument on premeditated and deliberate murder did not constitute a pattern of conduct so egregious that it rendered the trial fundamentally unfair, nor was it reasonably probable that Fabela would have obtained a more favorable result had the comments not been made. On this record, no prejudicial misconduct occurred.

III. **Cumulative Error**

Fabela argues the cumulative effect of the claimed errors deprived him of due process of law and a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.' " (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) Here, Fabela received a fair trial and has failed to show any cumulative error requiring reversal of his convictions.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


ADAMS, J.*

We concur:


EDMON, P. J.


LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.